**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1427-18T3

THE ESTATE OF FRANK
CHABORA, JR. by and through
SUSANNE MUNN as the Executrix,

 Plaintiff-Respondent,

v.

RAUL MORALES, a/k/a RAUL
BERROCAL, RAUL FIGUEROA,
and RAUL FIGEROA MORALES,

 Defendant-Appellant.

_____

    Argued November 14, 2019 – Decided February 7, 2020

    Before Judges Whipple, Gooden Brown and Mawla.

    On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. LT-006567-18.

    Roberta L. Tarkan argued the cause for appellant.

    Douglas M. Standriff argued the cause for respondent.

PER CURIAM

In this commercial landlord-tenant action, defendant Raul Morales, a/k/a Raul Berrocal, Raul Figueroa, and Raul Figeroa Morales (Morales) appeals from a November 29, 2018 Law Division order entering judgment of possession in favor of plaintiff Estate of Frank Chabora, Jr., by and through Susanne Munn as the Executrix (collectively, the Estate). Morales, who operated an auto repair shop in a garage located on the Estate's property, was served with a summons and complaint for possession, which attached a notice to quit that was delivered to Morales over a month earlier after the Estate stopped accepting his rent. The complaint alleged that Morales had been in possession of the premises pursuant to a month-to-month oral lease since February 2017. Following a bench trial, during which Morales asserted various procedural deficiencies and theories to support his continued occupancy, including the existence of a written lease terminating in 2030 which was assigned to his benefactor, the judge entered the judgment of possession that is the subject of this appeal.

On appeal, Morales raises the following points for our consideration:

> POINT ONE
>
> WHERE NO TENANT IS NAMED IN THE SUMMONS, THERE IS NO BASIS IN LAW TO ENTER A JUDGMENT OF POSSESSION.
>
> POINT TWO

AN ASSIGNMENT MAY HAVE TAKEN PLACE SINCE THERE WAS NO RESTRICTION IN THE LEASE.

We affirm.

We glean the following facts from the trial record. Prior to his death, Frank Chabora, Jr. owned and lived on the subject property, which was previously owned by his sister, Francine Chabora, who predeceased him in 2014. Frank[1] died in August 2017, leaving his daughter, Susanne Munn, to serve as the Executrix of his Estate. Prior to his death, Frank had rented to residential and commercial tenants portions of the property, which contained two houses, one of which Frank had lived in, a garage structure in the rear, and a car lot area near the front. The garage structure operated as an auto repair shop under the name Mike's Auto Repair Services (Mike's Auto), a used car dealer sold cars from the car lot area, and a residential tenant occupied the other house.

Munn testified that before becoming the Executrix of the Estate, she "had nothing to do with [the property]" and had not been on the property for at least a year prior to Frank's death. In the months following Frank's death, the used car dealer "collected . . . [the] rent" from the residential tenant and the garage

---

[1] We use first names to avoid any confusion caused by the common surname and intend no disrespect by this informality.

A-1427-18T3

operator and forwarded it to Munn along with his own. From September 2017 to January 2018, Munn received and accepted $1800 per month in rent for use of the garage from the person she "thought was [the garage's tenant] at the time . . . ." However, during a visit to the property, she learned that the person whom she believed to be the garage tenant "had sold [his] business, . . . le[ft] the country, and was not coming back." Munn testified that she then met with Morales, who informed her that he was "in charge, moving forward."

Thereafter, Munn accepted rent from Morales "[u]p until the end of August [2018], when [she] filed the notice to quit," and "stopped" accepting his rent payments. Believing she had a month-to-month oral lease with Morales that could be terminated with thirty days' notice, on July 21, 2018, her agent hand delivered a Notice of Lease Termination and Notice to Quit (notice to quit) dated July 19, 2018, addressed to Morales and Mike's Auto, notifying Morales "that the lease [was] terminated[,]" and requesting that he "quit the [p]roperty by no later than August 31, 2018." When Morales failed to vacate the premises by the deadline, on September 5, 2018, she served a summons and verified complaint on Morales, seeking a judgment of possession. Neither the summons nor the complaint included Mike's Auto in the caption.

Munn testified she asked Morales to vacate the property because his occupancy of the garage "interfere[d] with [her] management and running of the property[.]"  Munn stated that Morales left "[t]rash all over the place," allowed cars involved with his business to be "lined up" on the street and "[b]lock" the property's driveway, "built a wall without [her] knowledge or permission" in the garage, and failed to provide the Estate with proof of insurance.  In the notice to quit, Munn also indicated that Morales was "habitually late in paying the rent[.]"[2]

In contrast, Morales believed his occupancy of the garage was subject to a written lease, beginning February 1, 2008 and terminating January 31, 2030, executed on May 19, 2009, by and between Francine, the landlord and then-owner of the property, and Robert Tobar, the tenant (the 2030 lease).  The 2030 lease produced by Morales and admitted into evidence contained several handwritten notes.  Notably, the year "2030" and the monthly rent amount of "$1800" were both written by hand.

Munn produced a competing document that was also admitted into evidence, which she "found . . . in her father's house" after his death.  The

_____

[2]  According to Munn, the December 2017 and January 2018 rents for the garage were late.

document purported to be a written lease terminating in 2017 (the 2017 lease). The 2017 lease was "almost [a] duplicate" of the 2030 lease. However, the judge observed key "difference[s]" in the documents, including the fact that the 2017 lease terminated on "January [31,] 2017," and the monthly rent listed was "$2400," instead of $1800. Additionally, as the judge noted, unlike the 2030 lease in which terms were "obviously . . . altered" and "handwritten," the terms in the 2017 lease were "all typed" with no handwritten notations.

Further, whereas the 2017 lease contained only the signatures of Francine and Tobar, the 2030 lease was also signed by Frank directly adjacent to Francine's signature, notwithstanding the fact that Frank did not own the property as of the May 19, 2009 execution date. Another key difference between the leases was the fact that the 2017 lease was not notarized, while the 2030 lease was notarized by a notary public named Jack Fruchtman, whose commission expired on December 6, 2014. However, there was no date provided for Fructman's signature, and no notary acknowledgement indicating when and which signatures were notarized.

To support his claim that there was a valid assignment of the 2030 lease, Morales moved into evidence a partially typed undated document, purportedly transferring the 2030 lease (transfer document). The transfer document was

6

notarized on an unknown date by Fruchtman and contained several handwritten notes. Specifically, handwritten at the top of the transfer document were the words "sold the lease," "from: Robert Tobar," "to: new owner Victor Carhuallanqui."

Then, in typed and handwritten text, the transfer document read:

> I[,] Roberth Tobar[,] owner of the lease of the property . . . transfer my lease to: Victor Carhuallanqui; . . . . Reason: sold business . . . . The new owner . . . will run the business as a new tenant with the new name of the mechanic shop (rear garage)[,] he will be [in] charge to make the payments until the lease is over or sale . . . . Victor [C]arhuallanqui will make all the payments to [F]rank [C]haborra[.] I [R]oberth [T]obar certify this is a legal paper [and] will be legal with the notary['s] sign[ature] . . .

Three signatures appeared at the bottom of the transfer document, one with Victor Carhuallanqui's name printed underneath, one without a printed name underneath, presumably Tobar's, and one with Fruchtman's notary public stamp underneath. Once again, there was no notary acknowledgement indicating when and which signatures were notarized.

To support his claim that he was entitled to occupy the premises pursuant to the assignment of the lease evidenced by the transfer document, Morales produced a document titled "Power of Attorney," dated December 28, 2017, purportedly granting Morales power of attorney for Carhuallanqui's business

7

affairs (POA document).[3]  The POA document stated that "Carhuallanqui, the owner of Mike[']s Auto . . . grants Power of Attorney to Raul Figueroa Morales . . . to represent him" by "run[ning] and operat[ing] Mike[']s Auto . . . in all aspects . . . ."  The POA document contained a signature without a printed name underneath, along with Fruchtman's notary acknowledgement, which stated that the POA document was "[s]igned in the presence of the notary public in the [S]tate of New Jersey by all three parties[,]" and that the "[i]dentity of each of the parties was established by the notary on the basis of their respective documents."  Although the notary acknowledgment indicated "three parties" signed the document, only two signatures appeared, one signature with no signature line underneath and Fruchtman's signature above his printed name and notary stamp.

Based on these documents, Morales asserted his tenancy was subject to the 2030 lease, and, as such, he had "certain defenses [to eviction] based on that written lease" because Tobar's and then Carhuallanqui's "rights under that lease devolved upon . . . [him]."  Alternatively, Morales contended that Carhuallanqui was "still the tenant," "but because he [was] out of the country," he authorized

---

[3]  It is unclear in the record whether this document was admitted into evidence.

Morales to "operate the business" on his behalf pursuant to the POA document. Munn disputed the validity of the 2030 lease and the purported assignment.

In rendering his oral decision, over defense counsel's objection, the judge accepted "as true" Morales' proffer of the 2030 lease and the transfer document evidencing an assignment of the 2030 lease, thus obviating the need for Morales' testimony to verify the documents. The judge "accept[ed] . . . that there was a lease between Tobar and [Frank,]" and "[t]hat Tobar[] '[s]old[]' the lease to [Carhuallanqui]." However, based on the documents' contents, the judge determined the transfer document assigning the lease was "invalid" and not "legally binding" or enforceable against the Estate.

The judge explained that the transfer document was "a nullity" because it was "some sort of an agreement of selling a lease between the prior tenant, Tobar, and . . . [Carhuallanqui,]" but there was "no attornment between . . . [Frank] and [Tobar] or [Carhuallanqui] at the time of the execution of that [transfer] document." The judge added "there [was] no consent to the assignment[,]" and there was no way to tell when the transfer document was signed "because there[ was] no date on it."

As a result, the judge accepted Munn's position. The judge determined Morales was subject to "an oral month[-]to[-]month tenancy," and had no legal

"binding rights under . . . the original [2017] lease . . . , or the modified" 2030 lease. The judge found that as "a commercial tenant" subject to a month-to-month tenancy, Morales was not entitled to "the protection of the [A]nti-[E]viction [Act]."[4] The judge explained that as a commercial tenant, "[t]he landlord ha[d] a right" to evict Morales after providing him with "[thirty] days notice . . . to leave." The judge concluded that by serving a "Notice of Lease Termination" and "a Notice to Quit . . . on July 19[, 2018],"[5] and by not "accept[ing] rent," the Estate was entitled to "judgment of possession." This appeal followed.

"Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review[.]" Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011). "The general rule is that findings [of fact] by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova

---

[4] New Jersey's Anti-Eviction Act (Anti-Eviction Act), N.J.S.A. 2A:18-53 to -84, provides several "grounds for eviction," but "it is well recognized that '[t]he legislation was designed to protect residential tenants against unfair and arbitrary evictions by limiting the bases for their removal.'" Maglies v. Estate of Guy, 193 N.J. 108, 121 (2007) (alteration in original) (emphasis added) (quoting 447 Assocs. v. Miranda, 115 N.J. 522, 528 (1989)).

[5] N.J.S.A. 2A:18-56 provides that "the giving of [one] month's notice to quit . . . shall be deemed to be sufficient" in the case of a month-to-month tenancy.

Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility. Because a trial court hears the case, sees and observes the witnesses, and hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Id. at 412 (brackets omitted) (citations and internal quotation marks omitted).

"Therefore, an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (alteration in original) (quoting Rova Farms, 65 N.J. at 484). In contrast, a trial judge's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Informed by the governing standard of review, we turn to the substantive principles governing this appeal. It has long been established that in New Jersey,

> [w]henever a tenant whose original term of leasing
> shall be for a period of one month or longer shall hold
> over or remain in possession of the demised premises
> beyond the term of the letting, the tenancy created by
> or resulting from acceptance of rent by the landlord

shall be <u>a tenancy from month to month</u> in the absence of any agreement to the contrary.

[N.J.S.A. 46:8-10 (emphasis added).]

A month-to-month lease "[a]greement[] between the landlord and tenant need not be in writing nor even be expressed in words" because "[e]nforceable agreements also may be implied in fact from the conduct of the parties." <u>Young v. Savinon</u>, 201 N.J. Super. 1, 7-8 (App. Div. 1985) (citing <u>St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co.</u>, 32 N.J. 17, 23 (1960)). Thus, even if there is no written lease or oral agreement, when a landlord accepts rent from an individual occupying the landlord's property, such acceptance creates a month-to-month tenancy. <u>See</u> <u>ibid.</u>

"A month-to-month tenancy is a continuing relationship that remains unabated at its original terms until terminated by one of the parties." <u>Harry's Vill., Inc. v. Egg Harbor Twp.</u>, 89 N.J. 576, 583 (1982). A judgment of possession may be properly ordered "if a tenancy from month to month[] has been terminated by the giving of [one] month's notice to quit, which notice shall be deemed to be sufficient[.]" N.J.S.A. 2A:18-56; <u>see also</u> <u>Harry's Vill.</u>, 89 N.J. at 583 (explaining that "[e]ither party may terminate a monthly tenancy by serving upon the other a month's notice to quit").

A-1427-18T3

Here, we are satisfied the judge's determination that Morales was subject to a month-to-month tenancy, that was properly terminated when the Estate provided the requisite notice and ceased accepting rent, is supported by sufficient credible evidence in the record. Seizing on the analysis contained in the judge's amplified decision submitted pursuant to Rule 2:5-1(b), Morales asserts that because the judge indicated that "Mike's Auto . . . [was] the acceptable defendant but . . . was not named as a party[,]" there is no legal "basis to enter a [j]udgment of [p]ossession against [Morales,] the named defendant[,] since . . . the proper tenant [, Mike's Auto,] was never named." Counterintuitively, Morales also argues he "should then have had [an] opportunity to testify as to why he is a representative of Mike's Auto . . . or has standing." According to Morales, because he "was denied this opportunity[,]" he was "deni[ed] . . . due process." We disagree.

First and foremost, based on the alternating positions advanced by Morales in the trial court and on appeal, Mike's Auto could not be deemed the proper tenant because neither the 2030 lease nor the transfer document identified Mike's Auto as the tenant as intimated by the judge. "[I]f the order of [a trial court] is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance." Isko v. Planning Bd. of Livingston, 51 N.J.

13

162, 175 (1968). Moreover, Morales misconstrues the underlying rationale for the judge's decision. The judge determined that Morales' occupancy of the property was subject to a month-to-month tenancy governed by N.J.S.A. 46:8-10, which was properly terminated by the landlord, in whose favor the court entered a judgment of possession after affording Morales ample due process. See Nicoletta v. N. Jersey Dist. Water Supply Com., 77 N.J. 145, 162 (1978) ("The first prerequisite . . . of due process is fair notice, so that a response can be prepared and the respondent fairly heard." (citation omitted)). See also N.J.S.A. 2A:18-56 (requiring only "the giving of [one] month's notice to quit" to terminate a month-to-month tenancy).

The judge found a month-to-month tenancy after carefully analyzing the validity of the 2030 lease and the transfer document evidencing its assignment. Having determined that any assignment of the 2030 lease and any rights, entitlements, or benefits accruing from said assignment, as claimed by Morales, were invalid, we discern no abuse of discretion in the judge's decision precluding Morales' testimony. We base this conclusion on the fact that Morales was neither a party to the 2030 lease nor the transfer document, "indicated . . . he had no personal knowledge of the original transactions between [Frank, Francine, Tobar, or Carhuallanqui]," and produced a POA document that made

14

no mention of a lease assignment. See Alves v. Rosenberg, 400 N.J. Super. 553, 562 (App. Div. 2008) ("To be sure, 'a trial court is afforded considerable latitude regarding the admission of evidence, and is to be reversed only if the court abused its discretion.'" (quoting State v. Nelson, 173 N.J. 417, 470 (2002))).

Morales also challenges the judge's determination that the Estate was not bound by the assignment. He asserts the judge's "ruling that the documents are a fraud on their face . . . is incorrect as a matter of law" because "[a]t no time was any fraud shown." Further, Morales contends that "[a]ssignments do not require written authorization" and "are permitted by law unless a[n] agreement indicates otherwise." According to Morales, because "no agreement herein . . . indicates otherwise[,]" the judge erred in preventing Morales from testifying about the assignment.

Admittedly, before rendering his final decision, the judge indicated he was "ruling that . . . [the] documents [were] a fraud[] on their face." However, the judge later clarified that he was accepting the documents "as true" and premised his ruling accordingly.

As to the validity of the assignment, lease agreements and assignments of leases are subject to the Statute of Frauds, which provides:

A transaction intended to create a lease of real estate for more than three years shall not be enforceable unless:

a. the leased premises, the term of the lease and the identity of the lessor and the lessee are established in a writing signed by or on behalf of the party against whom enforcement is sought; or

b. the real estate, the term of the lease and the identity of the lessor and the lessee are proved by clear and convincing evidence.

[N.J.S.A. 25:1-12 (emphasis added).]

"Absent a prohibitory or restrictive contractual restraint, . . . a lease . . . [is] assignable and may be specifically enforced in equity at the suit of the assignee." Holmes v. Harris, 33 N.J. Super. 395, 403 (App. Div. 1954). However, under N.J.S.A. 25:1-12, while a lease term that "is less than the statutory period . . . may be transferred by oral agreement[,]" Stark v. Nat'l Research & Design Corp., 33 N.J. Super. 315, 322 (App. Div. 1954), an assignment of a lease term for more than three years requires a writing or clear and convincing evidence of the assignment. N.J.S.A. 25:1-12.

"Whether a transaction constitutes an assignment of a lease . . . is for the determination of the court in accordance with the generally recognized legal rules for the construction of contracts, and an important element is the intention of the parties." Stark, 33 N.J. Super. at 321. "In determining that intent, the

16

court must consider many factors, including the document itself and the surrounding circumstances." K. Woodmere Assocs., L.P. v. Menk Corp., 316 N.J. Super. 306, 316 (App. Div. 1998) (citing Broadway Maint. Corp. v. Rutgers, State Univ., 90 N.J. 253, 271-72 (1982)). Not only must a valid assignment "contain evidence of the intent to transfer one's rights, [but] 'the subject matter of the assignment must [also] be described sufficiently to make it capable of being readily identified.'" Id. at 314 (quoting 3 Williston, Contracts, § 404 at 4 (3d ed. Jaeger 1957)).

Here, in the absence of a prohibitory contractual restraint, a valid assignment of the 2030 lease under which Morales claims to have tenancy rights would require a writing or clear and convincing evidence of the assignment. However, based on the documents admitted into evidence, we agree there was no valid assignment. Likewise, because neither Tobar nor Carhuallanqui was produced at trial to testify about the assignment's validity, and Morales was neither a party to the transfer document nor possessed personal knowledge of its execution, Morales failed to present clear and convincing evidence of the

assignment,[6] thus breaking the link in the chain to Morales' purported occupancy under the 2030 lease.

Affirmed. The matter is remanded to the trial court to vacate the stay pending appeal and execute the judgment of possession in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] According to the judge, Tobar "was never subpoenaed" by the defense to appear "even . . . [at] the original trial date." Morales asserts that Fruchtman was available to testify. However, because the judge had "no doubt that . . . Tobar and [Carhuallanqui] signed [the transfer document,]" Fruchtman's testimony would have added nothing.

A-1427-18T3